Filed 5/13/22  In re Aaron R. CA2/4

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| In re AARON R., a Person Coming Under the Juvenile Court Law. | B315128 (Los Angeles County Super. Ct. No. 19CCJP07364A) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. CELESTE S., Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Robin R. Kesler, Referee.  Affirmed.

Annie Greenleaf, under appointment by the Court of Appeal, for Defendant and Appellant.

Rodrigo A. Castro-Silva, County Counsel, and Kim Nemoy, Assistant County Counsel, for Plaintiff and Respondent.

# INTRODUCTION

Aaron R. (born Dec. 2015) was declared a dependent of the juvenile court in February 2020, when the court sustained a petition in which respondent Los Angeles County Department of Children and Family Services (DCFS) alleged that mother and father had a history of engaging in violent altercations in Aaron's presence.  In November 2019, DCFS removed Aaron from mother's home and placed him in the home of relatives.  The court ordered family reunification services but terminated them a year later and set a permanency planning hearing.  At that hearing (in Sept. 2021), it was undisputed that the relatives would likely adopt Aaron.  (See *In re Caden C.* (2021) 11 Cal.5th 614, 630 (*Caden C.*).)  Mother, however, asserted the "beneficial parental relationship exception" to termination of parental rights.  (*Ibid.*)  The juvenile court rejected the exception and terminated mother's parental rights.

On appeal, mother contends the juvenile court erred when it did not apply the beneficial parental relationship exception.[1]  We disagree and affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

A. *Relevant Events Leading to the Permanency Planning Hearing*

On September 29, 2019, DCFS received a referral from the Pasadena Police Department reporting a domestic violence incident between

---

[1]     Father is not a party to the appeal.

mother (Celeste S.) and father (Alejandro R.) in Aaron's presence. It was also reported that father had been arrested five times for domestic violence. The last arrest, in 2016, involved mother and resulted in a conviction and restraining order, which father violated in the current incident.

On November 13, 2019, Aaron was detained and placed with parental relatives, Martha M. and Brenda A. (hereafter, caregivers). On November 15, 2019, DCFS filed a dependency petition on behalf of Aaron. The petition alleged Aaron's mother and father had a history of engaging in violent altercations in his presence. Father had a prior conviction for infliction of corporal injury on a spouse or cohabitant (mother). (Pen. Code, § 273.5, subd. (a).) Mother failed to enforce the restraining order by allowing father to reside in the family home and by granting him unlimited access to Aaron. On November 18, 2019, the juvenile court found a prima facie case for detaining Aaron and ordered monitored visitation, with mother and father visiting Aaron separately.

DCFS reported that during her visits with Aaron after removal, mother spent around 75 percent of the time on her cell phone. Mother admitted that one time at his childcare facility, she told Aaron, "Let's go home." She explained that she just wanted to see how he would react. Aaron responded he did not want to go with her and wanted to stay with the caregivers. When mother pressed him to leave, Aaron refused.

Although initially after removal Aaron told the caregivers that he missed mother, shortly thereafter he no longer expressed this sentiment. Moreover, Aaron's prior aggressive behavior "mellowed

down" after a few weeks with the caregivers. Aaron established a good bond with them and appeared happy. On one occasion, Aaron spontaneously mentioned the domestic violence incident of September 2019, and told the caregivers, "Mommy's mad at Daddy. . . . She started crying. He choked her like this [he demonstrated a strangulation with two hands]. Mommy was crying." In the meantime, despite the active restraining order, mother and father continued to contact each other.

On February 20, 2020, the juvenile court adjudicated the petition and declared Aaron a dependent under Welfare and Institutions Code section 300, subdivision (b),[2] based on mother and father's history of domestic violence in Aaron's presence. The court removed Aaron from parental custody and ordered Aaron to be suitably placed under the supervision of DCFS. The court also ordered DCFS to provide family reunification services and monitored visitation, again with mother and father visiting Aaron separately. Aaron remained placed with the caregivers.

Mother failed to show up during one of her scheduled visits with Aaron and left early during another visit because Aaron was playing with the caregivers instead of her. On March 20, 2020, the juvenile court suspended in-person visits due to the COVID-19 pandemic. Thereafter, mother had FaceTime visits with Aaron every day.

After in-person visitation resumed, DCFS reported that mother's visits were not productive. Mother would "spend most of the visit

---

[2] All further statutory references are to the Welfare and Institutions Code, unless otherwise stated.

4

laying on the sofa and playing on her phone. Other times mother would leave in the middle of the visit and was not participating with Aaron." The caregivers had to repeatedly prompt mother to involve herself with Aaron. However, mother was consistent in appearing for visitation.

In May 2020, mother was arrested for driving under the influence (Veh. Code, § 23152, subds. (a), (b)) and driving without a license (Veh. Code, § 12500, subd. (a)). In August 2020, mother entered a no contest plea to violation of Vehicle Code section 23152, subdivision (b) and was placed on summary probation for three years. She was ordered to enroll in a six-month licensed first offender DUI program. Mother provided DCFS with verification of enrollment in the program. Mother completed her parenting education and was in a continuous domestic violence program for victims. Mother enrolled in therapy as well as weekly drug and alcohol testing. After a therapy session with both mother and Aaron, the therapist expressed concerns over mother's ability to communicate with him.

At the six-month review hearing, the court stated mother's compliance with the case plan had been substantial and continued reunification services. However, the court declined to order unmonitored visitation or overnights for mother, based on the recent arrest.

DCFS reported that Aaron had established a close bond with the caregivers and was well-taken care of. At the same time, Aaron expressed he enjoyed his visits with mother and had positive interactions with her. In November 2020, after mother showed proof of

enrollment in all court-ordered programs, the court granted unmonitored visitation.

However, on December 6, 2020, mother was arrested for corporal injury on father (Pen. Code, § 273.5, subd. (a)) and for violating the domestic violence restraining order. DCFS reported that mother minimized the incident and did not believe alcohol was a factor. The court suspended mother's unmonitored visits. Although mother and Aaron participated in therapy sessions, the therapist reported that mother continued having trouble communicating with Aaron.

At the 12-month review hearing, Aaron's counsel joined DCFS's objection to unmonitored visitation due to the recent domestic violence incident between mother and father. Counsel argued that the parents were not appropriately addressing the issues that led to the dependency case. The court observed that mother's compliance with the case plan had been substantial, and granted continued reunification services, but only monitored visitation.

On February 3, 2021, another domestic violence incident occurred between mother and father. Father was arrested several days later. Although mother had completed most of the court ordered programs, DCFS reported that she had continued to minimize the domestic violence incidents and denied any violation of the restraining order. Therapy sessions between Aaron and mother were reduced to a monthly "check in" because the therapist concluded mother was not "interested in the . . . therapy" and was not "engaging or utilizing the techniques taught by [the] Therapist." As to the monitored visitation, Aaron appeared comfortable in mother's presence and interacted with her.

6

At the 18-month review hearing, given the history of the case, the court concluded that mother had not made substantial progress. The court terminated reunification services and set a permanency planning hearing.

B. *Permanency Planning Hearing*

DCFS reported that mother maintained ongoing phone and in-person visitation with Aaron. However, "the quality of the in-person visits need[ed] improvement." During the visits, Aaron spent most of the time playing video games while mother laid on his bed. Moreover, mother had trouble arriving on time and tended to leave early. Mother also had a habit of last-minute cancellations, no shows and not prioritizing Aaron by making other plans instead of keeping the scheduled visit. As to mother's telephone contact with Aaron, the conversations lasted only several minutes.

DCFS further reported mother and father continued to see each other in violation of the restraining order. Father told a social worker that mother had not changed and was still driving under the influence of alcohol. Father stated that mother was not capable of caring for Aaron because "they were . . . fighting and still partying." He believed it was best for Aaron to stay with the caregivers because Aaron was doing "really good" with them and "why put him in a bad situation."

On September 14, 2021, the juvenile court held the permanency planning hearing. The court received the DCFS reports in evidence and heard testimony from mother. Mother's counsel requested that the court not terminate her parental rights and find the beneficial parental

7

relationship exception applied. Aaron's counsel joined in DCFS's recommendation, asking the court to find Aaron adoptable and find that none of the exceptions to adoption apply. The court found the parental beneficial relationship exception did not apply because "not only [was] mother continuing to involve herself in the behavior that brought her family before the court, she has not occupied a parental role in this child's life since the case began, which was almost two years ago." The court further stated, "Visiting with a child on a monitored basis, having a few phone calls [was] not a parental role." Furthermore, the caregivers indicated mother was not engaged during visits, and phone calls with Aaron lasted only a few minutes. The court then terminated parental rights and the caretakers were designated as his prospective adoptive parents.

Mother timely appealed.

## DISCUSSION

Mother contends that she established the beneficial parental relationship exception to termination of parental rights. We disagree.

### A. *Applicable Law*

Once the juvenile court terminates reunification services and determines a dependent child is adoptable (a finding not in dispute here), it must select adoption as the permanent plan and terminate parental rights unless it finds doing so would be detrimental to the child under one of several statutory exceptions. (§ 366.26, subd. (c)(1); *Caden C., supra,* 11 Cal.5th at pp. 630–631.)

The beneficial parental relationship exception, at issue here, applies where the parent has "maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." (§ 366.26, subd. (c)(1)(B)(i).) Our Supreme Court clarified the three elements a parent must prove, by a preponderance of the evidence, to establish the exception: (1) the parent's regular visitation and contact with the child; (2) the child's "substantial, positive, emotional attachment to the parent," "the continuation of which would *benefit* the child"; and (3) that the termination of "that attachment would be detrimental to the child even when balanced against the countervailing benefit of a new, adoptive home." (*Caden C., supra*, 11 Cal.5th at pp. 631, 636.)

The first requirement, regular visitation and contact, is "straightforward" and "[t]he question is just whether 'parents visit consistently,' taking into account 'the extent permitted by court orders.'" (*Caden C., supra*, 11 Cal.5th at p. 632.)

"As to the second element, courts assess whether 'the child would benefit from continuing the relationship.'" (*Caden C., supra*, 11 Cal.5th at p. 632.) "[T]he relationship may be shaped by a slew of factors, such as '[t]he age of the child, the portion of the child's life spent in the parent's custody, the "positive" or "negative" effect of interaction between parent and child, and the child's particular needs.'" (*Ibid*.) Focusing on the child, "courts often consider how children feel about, interact with, look to, or talk about their parents." (*Ibid*.) Recognizing that "rarely do '[p]arent-child relationships' conform to an entirely

9

consistent pattern," the Supreme Court stated "it is not necessary—even if it were possible—to calibrate a precise 'quantitative measurement of the specific amount of "comfort, nourishment or physical care" [the parent] provided during [his or] her weekly visits.'" (*Ibid*.)

"Concerning the third element—whether 'termination would be detrimental to the child due to' the relationship—the court must decide whether it would be harmful to the child to sever the relationship and choose adoption." (*Caden C., supra*, 11 Cal.5th at p. 633.) "[C]ourts need to determine . . . how the child would be affected by losing the parental relationship—in effect, what life would be like for the child in an adoptive home without the parent in the child's life." (*Ibid*.) Thus, "'[i]f severing the natural parent/child relationship would deprive the child of a substantial, positive emotional attachment such that,' even considering the benefits of a new adoptive home, termination would 'harm[ ]' the child, the court should not terminate parental rights." (*Ibid*.)

We review for substantial evidence the juvenile court's findings whether the parent has consistently visited the child and whether a beneficial parental relationship exists. (*Caden C., supra*, 11 Cal.5th at pp. 639–640.) We review for abuse of discretion the court's finding whether termination of parental rights would be detrimental to the child because of the beneficial parental relationship. (*Id*. at p. 640.) Nevertheless, we review for substantial evidence any factual findings underlying the juvenile court's weighing of the harm of losing the

10

relationship against the benefits of adoption. (*Ibid.*) This "hybrid standard" *Caden C.* endorsed "simply embodies the principle that '[t]he statutory scheme does not authorize a reviewing court to substitute its own judgment as to what is in the child's best interests for the trial court's determination in that regard, reached pursuant to the statutory scheme's comprehensive and controlling provisions.'" (*Id.* at p. 641.)

B. *Analysis*

As a threshold matter, mother argues the juvenile court failed to make specific findings as to each element of the beneficial parental relationship exception. However, there is no requirement that the court, in finding the exception inapplicable, recite specific factual findings regarding any or all of the three elements of the exception. (*In re A.L.* (2022) 73 Cal.App.5th 1131, 1156.) Thus, although a statement by the court of its reasons for its decision is helpful in conducting appellate review, it is not a legal requirement. (*Ibid.*)

Here, substantial evidence supports the juvenile court's findings regarding the first two elements of the beneficial parental relationship exception. It is undisputed that mother demonstrated that she maintained (somewhat) regular visitation and contact with Aaron. Thus, the first element of the beneficial parental relationship exception is satisfied, albeit marginally.

The second element was not satisfied to establish Aaron had a substantial, positive, emotional attachment to her; the kind of attachment implying that Aaron would benefit from continuing the

relationship. (*Caden C., supra,* 11 Cal.5th at p. 636; see also *In re Autumn H.* (1994) 27 Cal.App.4th 567, 575.) Aaron was three years old when he was initially detained from parental custody after he witnessed violent altercations between mother and father. At the time of the permanency planning hearing, Aaron had been living with the caregivers for almost two years. Thus, he spent a large portion of his life outside of mother's care.

Mother contends Aaron enjoyed his visits with her and was comfortable in her presence. However, a parent must do more than exhibit "frequent and loving contact" (*In re Beatrice M.* (1994) 29 Cal.App.4th 1411, 1418), or show that the parent and child mutually enjoy their visits (*In re Elizabeth M.* (1997) 52 Cal.App.4th 318, 324). "A biological parent . . . may not derail an adoption merely by showing the child would derive *some* benefit from continuing a relationship maintained during periods of visitation with the parent. [Citation.] A child[, especially a young child,] . . . should not be deprived of an adoptive parent [where, as here,] the natural parent has maintained a relationship that may be beneficial to some degree, but that does not meet the child's need for a parent. [Citation.]" (*In re Angel B.* (2002) 97 Cal.App.4th 454, 466.)

Although the interaction between Aaron and mother was generally described as positive, the caregivers reported that mother spent 75 percent of her visits on the phone rather than engaging with Aaron. Mother had to be repeatedly prompted by the caregivers to interact with Aaron. Mother's telephone calls with Aaron lasted no more than several minutes. Moreover, mother struggled with

communicating with Aaron during therapy.  Eventually, the therapy sessions were reduced to a monthly "check-in" because of mother's general disinterest in therapy and her inability to engage in or utilize the techniques taught by the therapist.  In addition, although Aaron initially told the caregivers that he missed mother, he shortly thereafter no longer expressed this sentiment.

Mother contends that the juvenile court impermissibly considered the domestic violence a categorical bar to the parental beneficial relationship exception.  To the contrary, it was simply one (albeit very important) consideration in determining Aaron would not benefit from continuing his relationship with mother.  In short, the second element to the beneficial parental relationship exception was not satisfied.

Moreover, even assuming the second element was met, the juvenile court did not abuse its discretion by determining that any benefit Aaron derived from her relationship with mother was outweighed by the benefit he would receive through permanency and stability of adoption.  Aaron had no difficulty separating from mother when visits ended, and the caregivers had established a strong bond with Aaron.  Mother's relationship with Aaron was simply not that extraordinary case where preservation of parental rights outweighs the preference for adoption.  (*In re G.B.* (2014) 227 Cal.App.4th 1147, 1166.) In sum, the juvenile court acted within its discretion in rejecting the beneficial parental relationship exception.

## DISPOSITION

The order is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

                                   WILLHITE, J.

We concur:

MANELLA, P. J.

COLLINS, J.